UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NORTH STAR IP HOLDINGS, LLC,

                    Plaintiff,

      -against-

ICON TRADE SERVICES, LLC,

                    Defendant.

---

ICON TRADE SERVICES, LLC,

                    Counterclaimant/
                    Third-Party Plaintiff,

      -against-

NORTH STAR IP HOLDINGS, LLC, JALAPENO
PIZZA HOLDINGS LLC f/k/a REBECCA
MINKOFF HOLDINGS, LLC and JALAPENO
PIZZA LLC f/k/a REBECCA MINKOFF, LLC,

                    Counterclaim
                    Defendant and Third-
                    Party Defendants.

---

22-CV-7324 (JGLC)

**OPINION AND ORDER**

---

JESSICA G. L. CLARKE, United States District Judge:

      Plaintiff/Counter-Defendant North Star IP Holdings LLC ("North Star") brings this action against Defendant/Counterclaimant Icon Trade Services LLC ("Icon") seeking enforcement of rights in trademarks North Star purports to have acquired from Third-Party Defendants Jalapeno Pizza LLC f/k/a Rebecca Minkoff LLC ("RML") and Jalapeno Pizza Holdings LLC f/k/a Rebecca Minkoff Holdings LLC ("RM Holdings," together with RML, the "RM Companies" or "RM Defendants" or "Third-Party Defendants"). North Star alleges that Icon perpetrated acts of (1) trademark infringement, (2) false designation of origin and false association and (3) unfair competition by continuing to use the Rebecca Minkoff trademark or variations thereof after the

cessation of Icon's rights therein. Icon pleads five affirmative defenses and asserts four counterclaims against North Star and the RM Defendants.[1]

Pending before the Court are: (1) Icon's motion for summary judgment against North Star's federal trademark claims and unfair competition claim; (2) North Star's cross-motion for summary judgment against Icon's First Counterclaim and Third and Fourth Affirmative Defenses; and (3) the parties' motions to redact portions of their summary judgment papers and supporting materials. *See* ECF Nos. 75, 76, 91, 96, 101 104, 112, 134, 139, 145 and 156.

For the reasons stated herein, North Star's motion for summary judgment is GRANTED and Icon's motion for summary judgment is DENIED. The parties' motions to seal are GRANTED and DENIED in part.

## BACKGROUND

### A.  The RM Companies' Business and the Master License

In the early 2000s, Rebecca Minkoff began designing, marketing and selling apparel, bags, jewelry, eyewear and accessories under her name and related trademarks (the "Minkoff Trademarks" or "Marks"). ECF No. 113 ("Pl. Br.") at 4. In 2004, RML was formed to operate the business offered under the Minkoff Trademarks. ECF No. 138 ¶ 40. In 2009, RM Holdings was formed and came to own certain of RML's assets, including the Marks. *Id*. ¶ 41. In 2012, the RM Companies executed an agreement wherein RM Holdings agreed to license to RML the right to, *inter alia*, use and sublicense the Marks. *Id*. ¶ 42; ECF No. 119-8 (the "Intercompany License" or "Master License" or "MLA"). The MLA provided that:

> If [RML] institutes for its protection or is made a defendant in any proceeding under bankruptcy, insolvency, reorganization or receivership law, or if either party is placed in receivership or makes an assignment for benefit of creditors or is unable to meet its debts in the regular course of business, the rights granted by

---

[1]    Icon's Second Counterclaim is only against North Star. ECF No. 13 at 14.

[RM Holdings] hereunder shall immediately terminate, without any action or notice required, and all such rights shall revert back to [RM Holdings].

[. . .]

Upon expiration or termination of this Agreement for any reason whatsoever, [RML] and its sub-licensees shall immediately cease any use of the Licensed Trademarks or Licensed IP, including the manufacture, Advertising, Promotion and sale of any product or Package bearing any of the Licensed Trademarks or embodying any of the Licensed IP.

MLA ¶¶ 8.1, 9.2.

Until February 2022, Rebecca Minkoff Holding Company, LLC ("RMHCL") owned all of RM Holdings and approximately 96% of RML. ECF No. 137 ¶ 1.

### B.  The Licenses Between RML and Icon

Icon sells and distributes luxury consumer products such as handbags, luggage, jewelry and clothing on behalf of brands including Versace, Armani and Roberto Cavalli. ECF No. 115 ¶¶ 1–2. Icon designs and sells such goods under licensed trademarks pursuant to license agreements. *Id*. at ¶ 2. On October 25, 2019, RML and Icon executed a license agreement which granted Icon the "exclusive" right to use the Marks for various luggage items. ECF No. 137 ¶ 3; ECF No. 115 ¶ 4; ECF No. 158-1–2 (the "Luggage License"). On November 20, 2019, RML and Icon executed a license agreement that granted Icon the "exclusive" right to use the Marks for various denim clothing items. ECF No. 137 ¶ 3; ECF No. 115 ¶ 5; ECF Nos. 158-3–6 (the "Denim License," together with the Luggage License, the "Licenses").

The Licenses are largely identical. Both grant Icon rights to use the Marks for the specified purposes throughout the world until the end of a term ending December 31, 2022. ECF No. 115 ¶¶ 4–5; Licenses. Both expressly state that RM Holdings is the owner of the Minkoff Trademarks and has granted RML the right to sublicense the Marks pursuant to the Master License. ECF No. 138 ¶ 47. The Licenses include a sell-off provision, allowing Icon, in the event

of termination or expiration, the opportunity "for an additional period of 180 days following the date of termination only (the 'Sell-Off Period'), on an entirely non-exclusive basis, to sell the Inventory in the ordinary course and in accordance with the terms of this Agreement, but none of them may advertise the sale of Products during the Sell-Off Period." Licenses ¶ 18.2(a) (rights pursuant to the Sell-Off Period hereinafter the "Sell-Off Rights").

The Denim License was amended to add additional product categories and extend Icon's rights with respect to these additional categories through December 31, 2023. ECF No. 115 ¶ 9. The parties dispute whether the Denim License was renewed through December 31, 2025. *Id.* ¶ 10. On January 18, 2022, Icon instituted an action in the Supreme Court of the State of New York seeking, *inter alia*, a judgment declaring that the Denim License had been renewed. *Id.* Icon discontinued the state court action on August 23, 2022, before North Star commenced the current litigation. ECF No. 92 ¶ 20.

### C.  Rosenthal's Security Interest

In February 2007, lender Rosenthal & Rosenthal, Inc. ("Rosenthal"), entered into a factoring agreement (the "Factoring Agreement") with RML, which was guaranteed by RM Holdings in 2011. ECF No. 137 ¶ 8. As collateral security for the RM Companies' obligations under the agreements, each of the RM Companies granted to Rosenthal a security interest in substantially all of their assets, including the Minkoff Trademarks and the goodwill of the RM Companies represented by the Marks. *Id.* Rosenthal perfected its security interest in the Marks by means of filing a UCC Financing Statement in February 2007, which it amended in December 2013 and timely continued in April 2016 and April 2021. ECF No. 137 ¶¶ 9–11; Pl. Br. at 16.

In March 2011, Rosenthal and RML executed an Intellectual Property Security Agreement amending and/or supplementing the Factoring Agreement. ECF 108-1 (the "IP Security Agreement"). The IP Security Agreement covers "any agreements [RML] may now

have entered into or may in the future enter into authorizing third parties to use [RML's] presently existing intellectual property (singly and collectively the 'Licenses')." *Id.* at 1. As consideration for extending additional credit under the Factoring Agreement, Rosenthal took a security interest in collateral which included "all of [RML's] right, title and interest . . . in and to the [Rebecca Minkoff] Trademark[] and the good will of the business symbolized by the Trademark[] including, without limitation, all of [RML's] licenses . . . ." *Id.* ¶ 2. In the event of a default not timely remedied, the IP Security Agreement provides that Rosenthal "may succeed to the position of either Licensee or Licensor under the License Agreement, and receive all rights and benefits of such party under the License Agreement, including, without limitation, the right to enforce the Licenses and the right to sublicense the [Rebecca Minkoff] Trademark[]. . . ." *Id.* ¶ 9(b). Icon was aware of Rosenthal's security interest in the Marks at least as early as 2021. ECF 137 ¶ 12.

### D.  RML's Default and the Peaceful Possession Agreement

RML defaulted on its Factoring Agreement with Rosenthal. ECF No. 137 ¶ 13. In February 2021, Rosenthal and the RM Companies agreed to an amendment of the Factoring Agreement under which Rosenthal agreed to forebear from exercising its rights and remedies under the Factoring Agreement provided that the RM Companies complied with certain obligations. *Id.* ¶ 14. On or around June 16, 2021, Rosenthal notified the RM Companies of its termination of the forbearance agreement. *Id.* ¶ 16. On January 24, 2022, the RM Companies executed a Peaceful Possession Agreement. ECF No. 116-1 (the "Peaceful Possession Agreement"). Pursuant to this Agreement, the RM Companies agreed to surrender to Rosenthal "all assets and properties of the Minkoff Companies in which Rosenthal was granted a lien or security interest pursuant to the Factoring Documents and the Guarantee Documents as security

for the Obligations, and the proceeds and products of all of the foregoing, including, without limitation, in the Acquired Assets as defined in the Letter of Intent" (the "Collateral"). *Id*. ¶ 1(b). The Letter of Intent defined the "Acquired Assets" as "[a]ll assets of the Minkoff Companies in which Rosenthal has a security interest." ECF No. 136-2 at 2. RML agreed to surrender the Collateral, including the Minkoff Trademarks, to Rosenthal for sale by Rosenthal pursuant to Article 9 of the Uniform Commercial Code ("Article 9"). ECF No. 137 ¶ 17.

   **E.  Rosenthal's Article 9 Sale of the Marks to North Star**

   Rosenthal's counsel, Otterbourg P.C., represented Rosenthal in handling the Article 9 sale of the Collateral, including the surrendered Marks. ECF No. 137 ¶ 20. At the request of Rosenthal, CoMetrics Partners, a management consulting firm specializing in turn-around management of companies, was appointed special Situations Officer for the RM Companies. *Id*. ¶ 15. Gary Herwitz is the managing partner of the firm. *Id*. Rosenthal and Herwitz solicited multiple offers for the Collateral, including from Bluestar Alliance LLC ("Bluestar") and Sunrise Brands LLC ("Sunrise"), the majority owner of North Star. *Id*. ¶¶ 2, 23. With respect to Bluestar, Rosenthal contacted Icon's president, Joseph Edery, in the summer of 2021 to inform him that the RM Companies' assets would likely be for sale so that Edery could inform Bluestar's president, whose daughter is married to Edery's son. *Id*. ¶ 24. Subsequently, Herwitz and representatives of Bluestar and Icon had conversations about Bluestar's potential purchase of the Collateral, an acquisition in which Icon would have partnered with Bluestar as an investor. *Id*. ¶ 25; ECF No. 117-4 at 50:14–22. As part of these discussions, Herwitz informed Bluestar and Icon that the disposition of Collateral would be pursuant to an Article 9 sale. ECF No. 137 ¶ 26. Bluestar ultimately submitted a formal letter of intent to Rosenthal. *Id*. ¶ 27.

In 2021, Gerard Guez, the chairman and CEO of Sunrise, was introduced to the RM Companies by Rosenthal to discuss licensing opportunities. ECF No. 115 ¶ 13. Sunrise wholly owns North Star Opco, LLC and is the majority owner of Plaintiff North Star. ECF No. 137 ¶¶ 2, 30. Sunrise has never had any ownership interest in RMHCL or the RM Companies. *Id.* ¶ 2. These discussions included, *inter alia*, Sunrise becoming the RM Companies' new denim licensee of apparel bearing the Minkoff Trademarks. ECF No. 115 ¶ 13. Icon's President Edery was aware of these discussions. *Id.* ¶ 13. Rosenthal solicited multiple offers for the Collateral. ECF No. 146 at 8 n.14; ECF No. 137 ¶ 23. In January 2022, Rosenthal approached Sunrise about purchasing the Collateral. ECF No. 137 ¶ 28. Sunrise submitted a bid to purchase the Collateral, offering a purchase price higher than that offered by Bluestar. *Id.*

Rosenthal chose Sunrise/North Star's bid. *Id.* ¶ 29. On February 8, 2022, Rosenthal executed and delivered a Secured Party Bill of Sale evidencing its sale of the Collateral to North Star and North Star Opco, LLC (together, the "North Star Companies"). *Id.* The assets surrendered to the North Star Companies in the Secured Party Bill of Sale consisted of "assets of [RML and RMHCL] in which Rosenthal has a security interest," including "[a]ll trademarks, service marks design marks, logos, relating to the Rebecca Minkoff brand including registrations and applications" and "[a]ny licenses of [RML] and/or [RMHCL] as licensee which Buyer hereafter notifies [Rosenthal] that it elects to assume." ECF No. 116-2 ("Secured Party Bill of Sale"), Ex. B.

Sunrise/North Star expected that the Intercompany License would be terminated as part of the sale and that such termination would result in the "corresponding termination" of RML's licenses with third-party companies like Icon. ECF No. 115 ¶ 15; ECF No. 98 at 122:10–123:10. North Star states, and Icon disputes, that as part of the Article 9 sale, the RM Companies

terminated their Master License and, consequently, terminated all sublicenses entered by RML, including the Licenses. ECF No. 138 ¶ 52. The RM Companies entered a letter agreement with the North Star Companies whereby the North Star Companies acknowledged that they would be solely responsible for renegotiating any new sublicenses with former sublicensees of RML. *Id*.

### F.  Events Following the Sale

Icon first learned about the North Star Companies' acquisition of the Rebecca Minkoff brand through an article published by Women's Wear Daily on February 16, 2022. ECF No. 138 ¶ 53. Subsequently, Guez and Edery met in person and over Zoom, at which meetings Guez stated that Icon no longer was a licensee but expressed a willingness to enter into a new license with Icon for certain product categories. *Id*. ¶ 54. Edery disputed that the Licenses were terminated or extinguished. *Id*. On March 23, 2022, Evan Weintraub, on behalf of Icon, wrote a letter to Guez, stating, *inter alia*, "Icon's position that notwithstanding your recent comments to Icon's executives, the Denim License remains in full force and effect and that Icon continues to own the exclusive right in the Rebecca Minkoff brand in all categories under the Denim License, including denim and activewear." *Id*. ¶ 55; ECF No. 119-13. On March 31, 2022, Christian Trunnell, the General Counsel of Sunrise, wrote a letter to Icon on behalf of Sunrise and North Star stating that (1) the Licenses were terminated as a consequence of the termination of the Master License and (2) the Licenses were independently extinguished as a matter of law pursuant to the Article 9 sale. *Id*. ¶ 56; ECF No. 119-14. Around this time, each of RML's sublicensees, including Icon, were provided with a "Form of Notice to RM Licensees" notifying each of them that: (1) as a consequence of the termination of the Master License on February 7, 2022, "RML no longer has the right to license the Licensed Mark to you, and except with respect to any sell-off rights under your agreement with RML, your right to use the Licensed Mark under your

license agreement with RML has terminated"; and (2) North Star acquired the Minkoff

Trademarks from Rosenthal pursuant to an Article 9 sale. ECF No. 138 ¶ 57; ECF No. 92-8 (the

"Form of Notice").

Daniela Bocresion, who had oversight over Icon's product submissions when she worked

for RML, began working for one of North Star's affiliates at some point after the acquisition.

ECF No. 115 ¶ 21. In February and March 2022, Icon continued to communicate with Bocresion

and Rebecca Minkoff via email correspondence, telephone discussions and two product meetings

regarding Icon's product development and marketing efforts. *Id*. ¶ 22. On April 12, 2022,

Bocresion sent an email to Thomas Ott, Icon's Director of Business Development, stating that

she had been advised by North Star's lawyers that the Licenses were no longer in effect due to

North Star's acquisition of the Rebecca Minkoff brand. *Id*. ¶ 21; ECF No. 111-1. Icon

maintained that its rights under the Licenses remained in effect; on April 19, 2022, Icon's

counsel Bruce Ewing wrote to Trunnell, stating, *inter alia*, "it is Icon's position that it remains

the exclusive licensee of the Trademarks for the 'Products' defined in the two Licenses." ECF

No. 115 ¶ 30; ECF No. 119-15.

Icon continued to sell licensed products after the Article 9 sale to North Star, but Icon

maintains that this occurred during the Sell-Off Period permitted under the Licenses. ECF No.

100 ("Def. Br.") at 7–8. For the purposes of the instant motions, it is undisputed that any

purported Sell-Off period concluded on October 11, 2022. Pl. Br. at 31 n.14. Icon displayed

licensed products on soholuggage.com, its direct-to-consumer website, during and after the

purported Sell-Off period. ECF No. 115 ¶ 33. As of July 2023, Icon continued to display

licensed products on Soho Luggage's Instagram page and continued to display the Rebecca

Minkoff Mark and logo on its website on iconluxurygroup.com. *Id*. ¶ 35. The website reads,

"ICON develops and manages licensing programs for various brands in a variety of categories including Luggage, Women's and Men's Apparel. Some of our programs include: Rebecca Minkoff Activewear & Denim Collection." *Id.*

## PROCEDURAL HISTORY

North Star brings claims against Icon for (1) trademark infringement in violation of the Lanham Act and the common law; (2) false designation of origin and false association in violation of the Lanham Act; and (3) unfair competition in violation of the common law. ECF No. 23 ¶¶ 21–38 (North Star's first two claims together the "Trademark Claims").

Icon pleads five affirmative defenses: (1) failure to state a claim upon which relief may be granted; (2) unclean hands; (3) lack of standing due to lack of ownership of the trademarks upon which claims are founded; (4) the claims are barred by the Licenses; and (5) the claims are barred by failure to join necessary parties. ECF No. 28 at 7.

Icon also asserts four counterclaims: (1) declaratory judgment that the Licenses remain in full force and effect; (2) tortious interference with contract; [2] (3) breach of contract; and (4) breach of the implied covenant of good faith and fair dealing. ECF No. 13 ¶¶ 61–82.

On October 28, 2022, the Court issued a Civil Case Management Plan and Scheduling Order setting deadlines in this case. ECF No. 34. Pursuant to the parties' request, the scheduling order bifurcated discovery into two phases. The first phase permitted discovery into North Star's affirmative claims for relief, Icon's first counterclaim for a declaratory judgment (that the Licenses remain in effect) and Icon's affirmative defenses. *Id.* ¶ 12. The Court stayed all discovery into Icon's second, third and fourth counterclaims pending resolution of the first phase. *Id.*; ECF No. 33. The scheduling order contemplated beginning the second phase of fact

---

[2]     Icon's Second Counterclaim is only pled against North Star. ECF No. 13 at 14.

discovery and expert discovery after the culmination of the first phase, depending on the outcome of any dispositive motion practice. ECF No. 34 ¶ 12. The first phase of fact discovery is complete. ECF No. 152 at 4–5. The operative scheduling order is the Fourth Amended Civil Case Management Plan and Scheduling Order. ECF No. 71.

On September 30, 2022, North Star and Third-Party Defendants requested a pre-motion conference regarding their anticipated motion to dismiss Icon's counterclaims for breach of contract (in part) and breach of the implied covenant of good faith and fair dealing for failure to state a claim under the theory that Third-Party Defendants had sole, subjective discretion under the Licenses regarding approval of any products or designs bearing the previously licensed Minkoff Trademarks, and to dismiss the same claims under the theory that they are arbitrable. ECF No. 24. Icon disputes these grounds for dismissal. ECF No. 26. Pursuant to the operative scheduling order, North Star and Third-Party Defendants withheld filing this motion to dismiss, without prejudice and waiver, until the close of the first phase of discovery. ECF No. 152 at 4.

On June 2, 2023, Icon requested a pre-motion conference regarding Icon's anticipated motion for leave to file Amended Counterclaims and Third-Party Complaint. ECF No. 83. On June 13, 2023, the Court reserved decision on Icon's request to amend pending resolution of the instant motions for summary judgment and "in light of the parties' agreement that June 2, 2023, should be considered the operative date for purposes of assessing any delay in seeking leave to amend." ECF No. 90.

Pending before the Court are: (1) Icon's motion for summary judgment against North Star's federal trademark claims and unfair competition claim; (2) North Star's cross-motion for summary judgment against Icon's First Counterclaim and Third Affirmative Defense; and (3) the parties' motions to redact portions of their summary judgment papers and supporting materials.

## LEGAL STANDARD

The Court sets forth the standard for the motions for summary judgment and the motions to seal or redact.

## I.      Motion for Summary Judgment

To prevail on a motion for summary judgment, the movant must "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. *Celotex Corp.*, 477 U.S. at 22. If the movant meets its initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted).

When evaluating cross-motions for summary judgment, the Court reviews each party's motion on its own merits and draws all reasonable inferences in favor of the non-moving party. *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020); *Coutard v. Mun. Credit Union*, 848 F.3d 102, 114 (2d Cir. 2017). When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing "particular parts of materials in the record" to survive the summary judgment motion. Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "Only disputes over facts that might affect the outcome of the suit under the governing law" preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are

genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quoting *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 312 (2d Cir. 1997)).

## II.    Motion to Seal

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)) ("*Amodeo II*"). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernstein v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch*, 435 F.3d at 119–20 (2d Cir. 2006). First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id.* at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id.* Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120.

In addition to the common law right of access, there is also a qualified First Amendment right to access judicial documents. *Lugosch*, 435 F.3d at 120. Under the First Amendment "experience and logic" test, the court must consider whether the documents "have historically been open to the press and general public" and whether "public access plays a significant positive role in the functioning of the particular process in question." *Id*. (quoting *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92 (2d Cir. 2004)). If a First Amendment right of access applies, documents may only be sealed "if specific, on the record findings are made demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Id*. at 120 (quoting *In re New York Times Co.*, 828 F.2d 110, 116 (2d Cir. 1987)).

## DISCUSSION

Whether the Article 9 sale extinguished the Licenses, or Icon's rights thereunder, is dispositive of North Star's motion for summary judgment with respect to Icon's Fourth Affirmative Defense and First Counterclaim and also informs the Court's analysis of Icon's motion for summary judgment. *See infra* section II. Accordingly, the Court first turns to North Star's motion.

## I.   North Star's Motion for Summary Judgment is Granted

The Court finds that North Star is entitled to summary judgment regarding its ownership of the Minkoff Trademarks. The Court also grants North Star's motion with respect to Icon's Fourth Affirmative Defense and First Counterclaim because the Article 9 sale extinguished Icon's rights in the Collateral.

### A.   North Star is the Owner of the Marks

Icon's Third Affirmative Defense to North Star's Amended Complaint asserts: "Plaintiff lacks standing to prosecute its claims because it is not the owner of the trademarks upon which

such claims are founded." ECF No. 28 at 7. As an initial matter, this is not an affirmative defense. "An affirmative defense is a defendant's assertion of facts and arguments that, if true, will defeat the plaintiff's . . . claim, even if all the allegations in the complaint are true." *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (cleaned up). As an element of its claims, North Star must establish that it owns the Minkoff Trademarks. *See Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 69 (2d Cir. 2010) ("[O]wnership of the relevant trademark is one of the necessary elements . . . of trademark infringement under the Lanham Act.") (internal citation and quotation marks omitted); *Johnson & Johnson Consumer Co. v. Aini*, 540 F. Supp. 2d 374, 388 (E.D.N.Y. 2008) (ownership an element for a claim under 15 U.S.C. §§ 1114, 1125(a)). Icon's contention that North Star lacks trademark ownership is a negative defense, not an affirmative one. *See Helali v. Legarde*, No. 21-CV-141 (CR), 2022 WL 110685, at *4 n.2 (D. Vt. Jan. 11, 2022) ("A negative defense controverts the plaintiff's prima facie case.") (internal citation and quotation marks omitted).

Recognizing the foregoing, North Star moves for summary judgment on the issue of its ownership of the Minkoff Trademarks. Pl. Br. at 13. The Court construes North's Star's motion as seeking judgment on the trademark ownership element of its Lanham Act claims. *See* Fed. R. Civ. P. 56(a) (summary judgment may issue with respect to part of a claim or defense). The Court grants North Star's motion with respect to this element for the reasons set forth below.

The undisputed evidence shows that North Star is the owner of the Minkoff Trademarks as a matter of law. Rosenthal perfected its security interest in substantially all of the RM Companies' assets, including the Minkoff Trademarks and the goodwill of the RM Companies represented by the Marks. ECF No. 137 ¶¶ 9–11; Pl. Br. at 16. The RM Companies surrendered these assets to Rosenthal pursuant to the Peaceful Possession Agreement. ECF No. 116-1.

Rosenthal, exercising its rights as the secured party, sold these assets to North Star in the Article 9 sale. ECF No. 137 ¶ 29; *see* N.Y. U.C.C. ("UCC") § 9-610(a) ("After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral . . . ."). North Star thereby acquired all goodwill attendant to the Minkoff Trademarks. *See Creative Arts by Calloway, L.L.C. v. Brooks*, 48 F. App'x 16, 17 (2d Cir. 2002) (citing *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984)) ("A trademark is merely a symbol of goodwill and cannot be sold or assigned apart from the goodwill it symbolizes.").

Icon avers that North Star acquired the Licenses – which it contends remain in effect – in the Article 9 sale. ECF No. 135 at 5– 6, 14. At the same time, Icon expresses "serious doubts about the legitimacy of the Sale, including whether Rosenthal even had the right to foreclose on the assets of RM Holdings." *Id*. at 14 n.15. Nonetheless, Icon "does not seek to invalidate the sale because the RM Defendants no longer exist." *Id*. Based on these contradictory statements, it is unclear whether Icon still maintains that North Star "is not the owner of the trademarks upon which such claims are founded." ECF No. 28 at 7. In any event, the Court finds there is no dispute of fact that North Star is the owner of the Minkoff Trademarks. Accordingly, North Star's motion is granted with respect to trademark ownership. Icon's defense that North Star lacks trademark ownership is stricken.

### B. The Article 9 Sale Extinguished Icon's Rights in the Collateral

Icon's First Counterclaim seeks a declaratory judgment that "[t]he Licenses, together with all extensions and amendments thereto, are valid and binding contracts" which "remain in full force and effect." ECF No. 13 ¶ 61–64. Icon's Fourth Affirmative Defense asserts that "Plaintiff's claims are barred because Defendant holds a license to the trademarks in question." ECF No. 28 at 7. North Star moves for summary judgment against both the First Counterclaim

and the Fourth Affirmative Defense on the basis that Icon's rights under the Licenses have been extinguished as a matter of law by the Article 9 sale.[3]

"A secured party's disposition of collateral after default . . . discharges any subordinate security interest or other subordinate lien other than liens created under any law of this state that are not to be discharged." N.Y. U.C.C. § 9-617(a). Moreover, "[a] transferee that acts in good faith takes free of the rights and interests described in subsection (a), even if the secured party fails to comply with this article or the requirements of any judicial proceeding." N.Y. U.C.C. § 9-617(b). "The UCC provides that a purchaser of assets at a foreclosure sale ordinarily takes such assets free and clear of any lien or interest subordinate to the security interest of the foreclosing party, provided that the purchaser acts in good faith." *Quinn v. Thomas H. Lee Co.*, 61 F. Supp. 2d 13, 21 (S.D.N.Y. 1999), *aff'd sub nom.* 234 F.3d 1262 (2d Cir. 2000) (citing predecessor to N.Y. U.C.C. § 9-617); *see also Preferred Display, Inc. v. CVS Pharmacy, Inc.*, 923 F. Supp. 2d 505, 510–11 (S.D.N.Y. 2013) (secured party's UCC-compliant sale of the collateral "as a matter of law . . . transferred all rights in the collateral to [buyer], and terminated any subordinate interests in the collateral" pursuant to N.Y. U.C.C. § 9-617). Here, as a "good faith transferee," North Star took the Collateral free of Icon's rights therein, as discussed below.

### 1. Rights of Nonexclusive Licensee in the Ordinary Course

Generally, licensees' rights are subject to the security interest of the secured party and thus may be extinguished in a disposition of the collateral upon default. N.Y. U.C.C. § 9-321, Official Comment 2. The UCC provides limited exceptions in which licensees take free from the

---

[3]  North Star's other theory – that the termination of the Master License Agreement between RM Holdings and RML independently terminated Icon's rights under the Licenses – is not at issue in the instant motion practice. *See* Pl. Br. at 1.

security interest of the secured party.[4] Such exceptions apply when: (1) the secured party authorized disposition free of the security interest; (2) a licensee of a general intangible takes without knowledge of the security interest and before it is perfected; or (3) a licensee in the ordinary course takes its rights under a nonexclusive license free of a security interest in the general intangible created by the licensor. N.Y. U.C.C. §§ 9-315, 9-317, 9-321; *see also* THOMAS M. WARD & STEPHEN M. MCJOHN, INTELLECTUAL PROPERTY IN COMMERCE § 2:40 (June 2023). Here, it is undisputed that Rosenthal perfected its security interest in the Collateral prior to the execution of the Licenses and did not authorize RML's licensees to take free of its security interest.

Instead, the parties dispute whether the Licenses are exclusive or nonexclusive as a matter of law such that an exception would apply. "[T]he difference between 'exclusive' and 'nonexclusive' licenses concerns the continuing ability of the grantor to use or further license to others the licensed property during the period the license is in effect." *Corbello v. DeVito*, 832 F. Supp. 2d 1231, 1244 (D. Nev. 2011); *see also Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 430 (E.D.N.Y. 2013) (same); *Black's Law Dictionary* (11th ed. 2019) (defining "exclusive license" as "[a] license that gives the licensee the sole right to perform the licensed act, often in a defined territory, and that prohibits the licensor from performing the licensed act and from granting the right to anyone else; esp., such a license of a copyright, patent, or trademark right"); *id.* (defining "nonexclusive license" as "[a] license of intellectual-property rights that gives the

---

[4]    Icon's brief cites law discussing the rights of licensees in the intellectual property of bankrupt licensors notwithstanding sale of the debtor's assets pursuant to section 363 of the bankruptcy code. Def. Br. at 13–14. This authority is inapposite. A section 363 sale is not a foreclosure sale. *Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 710 (S.D.N.Y. 2014). Moreover, Congress enacted section 365(n) of the bankruptcy code "to make clear that the rights of an intellectual property licensee to use the licensed property cannot be unilaterally cut off as a result of the rejection of the license pursuant to Section 365 in the event of the licensor's bankruptcy." *In re SIMA Int'l, Inc.*, No. 17-21761 (JJT), 2018 WL 2293705, at *4 (Bankr. D. Conn. May 17, 2018) (internal citation omitted). There is no analogue in the UCC.

18

licensee a right to use, make, or sell the licensed item on a shared basis with the licensor and possibly other licensees").

The Licenses both state that "[t]he license granted hereunder is exclusive except as provided herein." Licenses ¶ 1.1(a). The Licenses grant Icon the "exclusive" right to use the Rebecca Minkoff Mark throughout the world "in connection with the manufacture, marketing, distribution and sale" of the licensed products. *Id*. These rights are not shared with other licensees except to the extent that RML already had commercial relationships in place with partners responsible for distributing or selling licensed products in certain countries and to whom Icon agreed to sell licensed products in those jurisdictions. *Id.* ¶¶ 1.1(a), 6.1–6.3. The Licenses exclude the rights granted specifically to Icon from those that RML, as licensor, may exercise at will. *Id*. ¶ 1.2(a)(i). The carve-outs pertaining to non-exclusive products indicate that the Licenses otherwise prohibited RML from performing the licensed acts or granting such rights to additional parties. *Id*. ¶ 1.2(a)(i)–(ii).

Furthermore, Icon repeatedly characterized the Licenses as exclusive in pre-litigation correspondence and in its Counterclaims. ECF No. 137 ¶ 6; ECF No. 138 ¶ 55. Icon's Rule 30(b)(6) designee testified that Icon understood the Licenses to mean that RML would not permit other companies to use the Minkoff Trademarks for the same product categories as those enumerated in the Licenses during the duration of their term. ECF No. 119-3 at 48:3–50:18, 59:23–61:23. Icon's Counterclaims are premised on the exclusivity of its rights under the Licenses to use the Minkoff Trademarks for specified purposes. ECF No. 13 at ¶¶ 22–23, 37, 74. Indeed, in the instant motion practice, Icon admits "the Licenses are exclusive for the enumerated product categories . . . ." ECF No. 135 ("Def. R. Br.") at 15.

19

Nonetheless, Icon argues that the Licenses are nonexclusive such that it takes safe harbor in Section 9-321(b) as an ordinary course nonexclusive licensee, thus shielding its interest in the Collateral from discharge by Rosenthal in the Article 9 sale.[5] Icon observes that the Minkoff Trademarks were licensed to third parties for use with respect to categories of goods beyond the scope of those covered by the Licenses. Def. R. Br. at 15. Icon also points to terms indicating that the Licenses did not grant Icon rights in the Marks equivalent to ownership. *Id*. at 17. As discussed below, these facts would not enable a reasonable finder of fact to conclude that the Licenses are nonexclusive.

The authority Icon cites – concerning when an exclusive license may amount to an assignment, or the requirements for a licensee to have standing to sue for infringement – is inapposite. *Id*. at 16–17. An exclusive license, irrespective of whether it confers such additional rights, does not fall under the ambit of Section 9-321(b). The Licenses grant Icon the "exclusive" right to use the Minkoff Trademarks throughout the world "in connection with the manufacture, marketing, distribution and sale of Products approved by Licensor." Licenses at 1. That this right entitled Icon to exclusive use of the mark for specific purposes – with circumscribed distribution rights, and without ownership of the Marks or the right to bring actions for infringement against

---

[5]     It is not entirely clear why the UCC's protection for licensees in the ordinary course excepted from protection exclusive licensees, whose bargained-for rights in the licensed intellectual property exceed those of nonexclusive licensees. WARD & MCJOHN § 2:40 ("Current § 9-321(b), as it was approved by the American Law Institute in May 1998 and the National Conference of Commissioners on Uniform State Laws in July of 1998, protected all licensees in the ordinary course, not just 'nonexclusive' licensees. Apparently, the last-minute change was prompted by pressure from segments of the copyright bar that did not want the protection of § 9-321(b) extended to exclusive copyright licensees. Recall that all exclusive licensees of a copyright take a 'transfer of copyright ownership.' The logic behind the change is not entirely clear. The broader reach of the prior language protected exclusive patent and trademark licensees who (unlike the exclusive copyright licensee) do not necessarily take an ownership interest with such a license.").

third parties – does not render the Licenses nonexclusive. *See First Shades v. Baby Blanket Suncare*, 914 F. Supp. 2d 339, 345 (E.D.N.Y. 2012) (collecting cases of licensees whose rights were exclusive notwithstanding lack of ownership or ability to independently sue third parties for infringement); *L'Oreal USA, Inc. v. Trend Beauty Corp.*, No. 11-CV-4187 (RA), 2013 WL 4400532, at *10–12 (S.D.N.Y. Aug. 15, 2013) (restrictions on licensee's rights to use trademark militated against a finding of transfer of ownership or assignment but did not themselves call into question whether the license was exclusive).

Accordingly, the Court finds that the Licenses are exclusive as a matter of law such that Section 9-321(b) does not apply. Icon took its rights under the Licenses subject to Rosenthal's security interest and at risk of discharge in the event of RML's default and a subsequent disposition of the Collateral by Rosenthal. Thus, North Star took its rights in the Collateral free of Icon's interest therein as long as it acted as a good-faith transferee pursuant to Section 9-617(b).

### 2. Rights of Good Faith Transferee

Icon argues that North Star is not a good-faith transferee within the meaning of Section 9-617(b). The UCC defines good faith as "honesty in fact in the transaction or conduct concerned." N.Y. U.C.C. § 1-201(b)(20). For the purposes of Article 9, good faith "means honesty in fact and the observance of reasonable commercial standards of fair dealing." N.Y. U.C.C. § 9-102(a)(43). The inquiry under Section 9-617(b) evaluates whether the transferee acted "in good faith in its capacity as transferee . . . ." *Rapillo v. CitiMortgage, Inc.*, No. 15-CV-5976 (KAM), 2018 WL 1175127, at *8 (E.D.N.Y. Mar. 5, 2018). A good-faith transferee takes free of subordinate interests in the collateral even if the secured party "fails to comply" with the requirements of Article 9, including the requirement that "[e]very aspect of a disposition of collateral . . . must be

commercially reasonable." N.Y. U.C.C. §§ 9-617(b); 9-610(b). However, "a transferee that acts with knowledge of the defects of the disposition or acts in collusion with the secured party is not acting in good faith." *Hawkland UCC Series* § 9-617:3 (citing UCC § 9-617, Official Comment 3). The Court evaluates whether North Star acted with honesty in fact and in a commercially reasonable manner with respect to its purchase of the Collateral from Rosenthal.

There is no genuine issue of material fact that North Star acted with honesty in fact in its purchase of the Collateral from Rosenthal. In January 2022, Rosenthal approached Sunrise about purchasing the Collateral. ECF No. 137 ¶ 28. Sunrise submitted a bid to purchase the Collateral, offering a purchase price higher than that offered by Bluestar. *Id*. Rosenthal selected Sunrise/North Star's bid. *Id*. ¶ 29. On February 8, 2022, Rosenthal executed and delivered a Secured Party Bill of Sale evidencing its sale of the Collateral to the North Star Companies. *Id*. There is no evidence before the Court that provides a basis to question that Sunrise or North Star acted with honesty in fact in effectuating this transaction.

Icon's arguments that North Star did not act with honesty fail as a matter of law. First, Icon claims the Form of Notice to RM Licensees included a misleading representation with respect to confidentiality. Def. R. Br. at 13 n.12. But this alleged misconduct occurred *after* the sale and does not pertain to North Star's honesty in the purchase of the Collateral from Rosenthal.

Second, Icon submits that North Star's alleged involvement in the negotiation of the Peaceful Possession Agreement, its "side-deals" with the RM Companies and its former employees, and its scheme to "usurp" Icon as RML's denim licensee constitute bad faith "collusion." *Id*. at 12. Rosenthal solicited multiple offers for the Collateral. Sunrise/North Star submitted a bid in the same bidding process in which Bluestar participated. Icon partnered as an

22

investor in Bluestar's bid to acquire the Collateral from Rosenthal. Icon's claims that "the entire Sale was cooked up among North Star, the RM Defendants and Rosenthal" fail to raise questions of material fact regarding North Star's good faith participation in this same bidding process. *See id*. at 11.

Icon argues that North Star acted in bad faith by scheming to "usurp" Icon as RML's denim licensee and by negotiating directly with the RM Companies. *Id*. at 6–8, 11–12; ECF No. 137 ¶ 31. That a buyer seeks to take the collateral free of encumbrances is expressly contemplated by the UCC. *See Hawkland UCC Series* § 9-617:1 ("These provisions, transferring the collateral to the transferee for value free from rights of the debtor and holders of subordinate security interests and liens, were intended by the drafters to free purchasers from worries about title and, thus, to encourage higher prices. Indeed, if the transferee's interest were not so protected, prospective transferees might not be attracted to the disposition at all."). That North Star knew of the Licenses prior to the sale, and Sunrise had discussed licensing opportunities with the RM Companies, does not call into question whether Sunrise/North Star acted with honesty. Moreover, Icon has adduced no evidence that Sunrise/North Star improperly prevented Icon from exercising rights Icon had in the Collateral prior to or during the Article 9 sale process. Nor does Icon adduce evidence that North Star was consequentially involved in the negotiation of the Peaceful Possession Agreement between the RM Companies and Rosenthal, or cite authority indicating that such involvement would constitute bad faith collusion. Regarding North Star's dealings with Rosenthal, a close relationship between an Article 9 buyer and seller does not in itself suggest foul play. *See Preferred Display*, 923 F. Supp. 2d at 510–11 (where a secured party instituted the public sale of collateral and then purchased the collateral itself, the sale "terminated any subordinate interests in the collateral" pursuant to Section 9-617). Furthermore,

the Court is not persuaded that negotiation between a secured party, a cooperating debtor and a transferee in a private disposition of collateral is necessarily collusive. Contrary to Icon's insinuations, *see* Def. Br. at 7, the Court also finds unremarkable – and irrelevant to North Star's good faith – that CoMetrics Partners and Gary Herwitz assisted the RM Companies at the request of Rosenthal, the RM Companies' lender.

Lastly, the Court is not persuaded that Icon's concerns with the speed or payment structure of the Article 9 sale raise issues of material fact regarding good faith. There is no indication that Bluestar or Icon expressed any such concerns with respect to their bid in the same sale process. While Icon now characterizes Rosenthal's Article 9 sale process as "rushed," *see* Def. Br. at 7, it does not explain how this would compromise North Star's good faith participation therein, and the Court is unpersuaded that it does. Regarding payment structure, the Court does not find the consideration that Sunrise/North Star paid to Rosenthal, the guarantees exchanged or the equity interests it granted to be commercially unreasonable. Nor was it unreasonable – to the extent relevant, if at all, to assessing good faith with respect to the purchase of the Collateral – for the North Star Companies, in light of their acquisition of the Minkoff brand, to hire or offer membership interests to individuals formerly affiliated with the RM Companies. To the extent Icon's allegations of collusion raise further issues, they do not call into question whether North Star acted with honesty in fact or observed reasonable commercial standards with respect to the transaction in question, namely, its purchase of the Collateral from Rosenthal.

Aside from the issues already addressed above, Icon has not adduced evidence that North Star was aware of defects in Rosenthal's compliance with the requirements of Article 9 in effectuating the sale. The record reflects that North Star acted in good faith in purchasing the

Collateral from Rosenthal, and Icon failed to present any viable facts to the contrary. Accordingly, pursuant to Section 9–617(b), North Star took its rights in the Collateral free of Icon's interest therein. The Article 9 sale thus extinguished as a matter of law all of Icon's rights in the Collateral, including its Sell-Off Rights.

### 3. Successor Liability

The doctrine of successor liability does not revive Icon's extinguished rights. Successor liability provides an exception to the rule that "[w]hen a corporation purchases the assets of another corporation, it does *not* acquire its liabilities." *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 227 (2d Cir. 2014) (emphasis in original). "[W]here creditors foreclose on a debtor's collateral and sell the collateral to a new entity meant to carry on the business, the debtor's other creditors may be able to sue the new entity under State law theories of successor liability . . . ." *Marblegate Asset Mgmt., LLC v. Educ. Mgmt. Fin. Corp.*, 846 F.3d 1, 16 (2d Cir. 2017). A successor corporation may be held liable for the obligations of its predecessor if: "(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d. Cir. 2006) (internal citation omitted). Icon submits that – as a sublicensee of the debtor with subordinate rights in the assets sold – it may nonetheless pursue the purchaser of the Collateral as if it were an aggrieved creditor of RMHCL. This contention lacks merit. *See Airball Cap. LLC v. Rosenthal & Rosenthal Inc.*, 155 N.Y.S.3d 61 (Sup Ct, NY County 2021) (dismissing causes of action based on successor liability where party asserting such claims was "neither a debtor, obligor nor one holding a security interest or lien in the subsidiary entities"). Icon's rights in the

Collateral have been extinguished. Thus, North Star's motion is granted with respect to Icon's Fourth Affirmative Defense and First Counterclaim.

## II.      Icon's Motion for Summary Judgment is Denied

North Star brings claims against Icon for (1) trademark infringement in violation of 15 U.S.C. § 1114(1) and the common law, (2) false designation of origin and false association in violation of 15 U.S.C. § 1125(a) and (3) unfair competition in violation of the common law. Icon moves for summary judgment dismissing North Star's federal Trademark Claims and unfair competition claim. Icon's motion is denied.

Icon's rights in the Collateral, including its Sell-Off Rights, were extinguished by the Article 9 sale no later than February 8, 2022. *See supra* section I(B). Thus, the Court need not consider North Star's alternative theory that the termination of the Master License terminated Icon's rights under the Licenses. Nonetheless, Icon contends that North Star's claims fail because Icon did not use the Minkoff Trademarks "in commerce" as required by the Lanham Act during the relevant time period. The Court denies Icon's motion because a reasonable factfinder could conclude that Icon's continued use of the Marks constitutes "use in commerce" under the Lanham Act.

### A.  Trademark Claims

The Lanham Act prohibits the unauthorized "use in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To succeed in establishing liability for infringement under the Lanham Act, a plaintiff must prove: (1) that it owns a valid, protectible trademark; (2) that the defendant used the trademark in

commerce and without consent; (3) that such use was "in connection with the sale . . . or advertising of goods or services," and (4) that there was a likelihood of consumer confusion. *1–800 Contacts, Inc. v. WhenU.Com, Inc.*, 414 F.3d 400, 406 (2d Cir. 2005); 15 U.S.C. § 1114(1). Section 43(a) of the Lanham Act prohibits the "use [ ] in commerce" of any term or false designation of origin "which is likely to cause confusion . . . as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1). To succeed in establishing liability for false designation of origin under the Lanham Act, a plaintiff must prove that (1) the mark is entitled to protection, (2) defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods and (3) defendant made "use in commerce" of the protected mark. *LoanStreet, Inc. v. Troia*, No. 21-CV-6166 (NRB), 2022 WL 3544170, at *9 (S.D.N.Y. Aug. 17, 2022); 15 U.S.C. § 1125(a)(1)(A).

### 1. "Use in Commerce" Requirement

A claim under the Lanham Act must show, as a threshold matter, that the defendant has made "use in commerce" of the plaintiff's trademark. *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009); *1-800*, 414 F.3d at 412. Icon contends that it did not "use in commerce" the Minkoff Trademarks after the purported Sell-Off Period concluded; thus, North Star cannot establish a required element of its Lanham Act claims. Def. Br. at 10–13; Def. R. Br. at 25–27. As previously discussed, *see supra* section I(B), Icon's rights in the Collateral, including its Sell-Off Rights, were extinguished by the Article 9 sale no later than February 8, 2022. Icon does not dispute that it sold or transported goods in commerce bearing the Minkoff Trademarks as late as October 3, 2022. *Id*. at 26; ECF No. 92 ¶ 27. Thus, there is at least an eight-month window in which Icon used the Minkoff Trademarks in connection with sale or transport of goods after its

rights in the Collateral were extinguished. Whether North Star is estopped from alleging infringement pursuant to Icon's use of the Marks during the purported Sell-Off Period is discussed later. *See infra* section II(A)(2).

North Star also characterizes as infringing uses Icon's (1) display of licensed products on soholuggage.com, its direct-to-consumer website, during and after the purported Sell-Off Period; (2) continued display of licensed products on Soho Luggage's Instagram page; (3) continued display of the Minkoff Trademark and logo on its website on iconluxurygroup.com; and (4) continued representation on its website that Icon manages licensing programs for the "Rebecca Minkoff Activewear & Denim Collection" (these four uses together the "Continued Uses"). Icon claims these do not constitute "uses in commerce" subjecting it to liability under the Lanham Act because they were not accompanied by actual offers of services or transport or sale of goods. Def. R. Br. at 26. Icon maintains that the above-enumerated uses of the Minkoff Trademarks are not actionable for infringement or false designation of origin because, after October 4, 2022, they were not accompanied by actual transactions involving Minkoff-branded products or services from which Icon profited.

The Lanham Act defines "use in commerce," in relevant part, as follows:

For purposes of this Chapter, a mark shall be deemed to be in use in commerce–

(1) on goods when–

> (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

> (B) the goods are sold or transported in commerce, and

(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . .

15 U.S.C. § 1127. The Second Circuit held in *1-800* that a defendant's conduct is not actionable under the Lanham Act unless it falls within the Section 1127 definition of "use in commerce." 414 F.3d at 407–08 (2d Cir. 2005). Although there is some question about the viability of this holding,[6] the Second Circuit has not overruled *1-800*, so its rule remains binding. *Can't Live Without It, LLC v. ETS Express, Inc.*, 287 F. Supp. 3d 400, 415 (S.D.N.Y. 2018) (concluding that courts in the Second Circuit are required to apply the Section 1127 "use in commerce" definition to infringement claims even though it is "plainly apparent from context that [it] does not apply to infringement claims") (internal quotation marks omitted). Thus, the court assesses whether the "Continued Uses" are "uses in commerce" within the meaning of Section 1127.

"[I]n determining whether the plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 306 (2d Cir. 2013). "A plaintiff is not required to demonstrate that a defendant made use of the mark in any particular way to satisfy the 'use in commerce' requirement." *Id*. at 305. The term "use in commerce" is "broad and has a sweeping reach." *LoanStreet*, 2022 WL 3544170, at *10 (internal citation and quotation marks omitted). "A court must determine whether a trademark has been used in commerce, on a case by case basis, considering the totality of the circumstances around the use of the mark." *Threeline Imports, Inc. v. Vernikov*, 239 F. Supp. 3d 542, 558 (E.D.N.Y. 2017) (internal quotation marks and citation omitted)

---

[6] Courts have criticized this rule for conflating the kind of "use" that qualifies a mark for registration with the kind of "use" that constitutes infringement. *See VersaTop Support Sys., LLC v. Georgia Expo, Inc.*, 921 F.3d 1364, 1370 (Fed. Cir. 2019) (finding that the definition of "use in commerce" in Section 1127 "does not apply to trademark infringement"); *New Balance Athletics, Inc. v. USA New Bunren Int'l Co. Ltd. LLC*, 424 F. Supp. 3d 334, 344 (D. Del. 2019) (collecting cases holding that Section 1127 "sets the standard for a mark to qualify for protection or registration, not the standard for proving infringement"). In an unusual appendix to the *Rescuecom* decision, several judges of the Second Circuit – with the blessing of the *1–800* panel – concluded in *dictum* that Congress intended Section 1127 to define the kind of use that qualifies a mark for registration; Congress did not intend for it to exempt infringers from liability. 562 F.3d at 131–41.

Use of marks in advertising may constitute "use in commerce." *See C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 240 (S.D.N.Y. 2013) ("use in commerce" requirement met where defendant promoted branded products on its website even though there was no evidence that any sales occurred); *Peek & Cloppenburg KG v. Revue, LLC*, No. 11-CV-5967 (DAB), 2012 WL 4470556, at *4 (S.D.N.Y. Sept. 19, 2012) (advertising, unaccompanied by shipment of goods, constituted "use in commerce" for purposes of trademark infringement); *Trane Int'l Inc. v. Calentadores de Am., S.A. de C.V.*, No. 21-CV-4497 (DLC), 2022 WL 1523527, at *2, 4 (S.D.N.Y. May 13, 2022) (display of mark on defendant's website among a list of brands in defendant's portfolio "constitutes use in commerce, in connection with the advertising of goods"); *McCarthy on Trademarks and Unfair Competition* § 25:26 (5th ed.) ("Merely advertising using an infringing mark is itself a separate act of infringement. The statutory phrase "offering for sale" in [the] Lanham Act . . . means that the defendant need not be proven to be in possession of infringing or counterfeit goods at the time of the offer to sell or that the defendant made an actual sale. An offer to sell without more will suffice to establish liability. However, if all the accused has done is advertise using an infringing mark and made no sales, there will probably be no damages: in such a case, an injunction is the only remedy.").

It is undisputed that Icon sold goods bearing the Minkoff Trademarks as recently as October 3, 2022. Def. R. Br. at 26; ECF No. 92 ¶ 27. Icon argues that the Continued Uses are not "uses in commerce" because it has not made sales of Minkoff branded goods since October 4, 2022 or executed transactions pursuant to the Minkoff licensing programs referenced on its website. Def. Br. at 12–13; Def. R. Br. at 26. Such suspension or cessation does not insulate Icon from liability in the face of its continued use of the Minkoff Trademarks to advertise or promote its business. *See C=Holdings*, 992 F. Supp. 2d at 240; *Peek & Cloppenburg*, 2012 WL 4470556,

at \*4; *Trane Int'l*, 2022 WL 1523527, at \*2, 4. Considering the totality of the circumstances around Icon's use of the Minkoff Trademarks, and viewing the evidence in the light most favorable to North Star, a reasonable factfinder could conclude that the Continued Uses are "uses in commerce" under the Lanham Act.

### 2.   Equitable Estoppel

Icon's rights in the Collateral, including its Sell-Off Rights, were extinguished by the Article 9 sale no later than February 8, 2022. *See supra* section I(B). Icon does not dispute that it sold or transported goods in commerce bearing the Minkoff Trademarks as late as October 3, 2022. However, Icon argues that North Star is estopped from alleging infringement pursuant to Icon's use of the Marks during the purported Sell-Off Period. For the purposes of the instant motions, it is undisputed that any purported Sell-Off Period concluded on October 11, 2022. Icon argues that, by means of the Form of Notice, North Star consented to Icon's use of the Minkoff Trademarks during the Sell-Off Period. Accordingly, Icon maintains that North Star is now estopped from withdrawing that consent, notwithstanding the Article 9 sale. Def. Br. at 15–16; Def. R. Br. at 22.

The Form of Notice provided Icon notice that: (1) as a consequence of the termination of the Master License on February 7, 2022, "RML no longer has the right to license the Licensed Mark to you, and except with respect to any sell-off rights under your agreement with RML, your right to use the Licensed Mark under your license agreement with RML has terminated"; and (2) North Star acquired the Minkoff Trademarks from Rosenthal pursuant to an Article 9 sale. Form of Notice; ECF No. 138 ¶ 57. The Form of Notice further provided that North Star, as the new owner, was "open to discussing a possible resumption of [Icon's] right to use the Licensed Mark under a new license agreement with North Star." Form of Notice.

"The doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) (citation omitted); *see also Restatement (Third) of Unfair Competition* § 29 (1995) ("The trademark owner may also be estopped from terminating the consent if the termination would be inequitable because of the actor's reasonable reliance, evaluated in light of the specific terms of any agreement between the parties."). "Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment." *Kosakow*, 274 F.3d at 725.

There are genuine issues of material fact that preclude summary judgment in favor of Icon on the basis of equitable estoppel. There is a factual dispute whether North Star made a misrepresentation in the Form of Notice. It is undisputed that the Form of Notice was sent and signed by the Minkoff Defendants. Def. Br. at 14. The Form of Notice was drafted by counsel for the RM Companies. ECF No. 115 ¶ 25. The record reflects that Trunnell, the General Counsel of Sunrise, helped draft the Form of Notice and provided input on its substance, including that it should reference both the termination of the Master License and the fact of the Article 9 sale, and that it should be sent to Icon. ECF No. 115 ¶ 25–26; ECF No. 93-3 at 3. The Form of Notice informed Icon that the termination of the Master License did not terminate its Sell-Off Rights; it did not affirmatively represent that such rights remained in full force notwithstanding the effect of the Article 9 sale. Assuming the Form of Notice is attributable to

North Star – which remains a dispute of fact – Icon has not adduced evidence sufficient to show that North Star made a factual misrepresentation regarding Icon's rights in the Collateral.

There is also a factual dispute as to what extent Icon relied on the representation in the Form of Notice regarding Sell-Off Rights, and whether such reliance was reasonable. Icon argues that course of conduct supports its reasonable reliance. In February and March 2022 – after the Article 9 sale and receipt of the Form of Notice – Icon continued to communicate with Daniela Bocresion and Rebecca Minkoff via email correspondence, telephone discussions and two product meetings regarding Icon's product development and marketing efforts. On April 12, 2022, Bocresion sent an email to Thomas Ott, Icon's Director of Business Development, stating that she had been advised by North Star's lawyers that the Licenses were no longer in effect due to North Star's acquisition of the Rebecca Minkoff brand. Icon contends that business as usual during the intervening period supports a reasonable inference that its Sell-Off Rights were still in effect. Def. Br. at 15–16; Def. R. Br. at 22. The Court assumes, *arguendo*, that the relevant conduct of Bocresion and Rebecca Minkoff during February and March 2022 occurred at the direction of, or is otherwise attributable to, North Star.

Nonetheless, there is a factual dispute as to whether Icon relied on the Form of Notice's purported misrepresentation regarding its Sell-Off Rights. After learning of North Star's position that the Licenses were no longer in effect, Icon took the "position that it remains the exclusive licensee of the Trademarks for the 'Products' defined in the two Licenses." ECF No. 115 ¶ 30; ECF No. 119-15. Similarly, Icon's First Counterclaim seeks a declaratory judgment that "[t]he Licenses . . . are valid and binding contracts" which "remain in full force and effect." ECF No. 13 ¶ 61–64. There are also unresolved questions of fact as to whether Icon's course of conduct was consistent with its purported reliance on the Sell-Off provision. For example, Icon has not

adduced evidence that it made good faith efforts to comply with the Licenses' Sell-Off provisions concerning preparation of an inventory schedule or accounting and payment of royalties. *See* Denim License ¶¶ 10.4, 18.1–18.3. North Star claims Icon has only recently asserted that its use of the Minkoff Trademarks after the Article 9 sale was pursuant to the Sell-Off provision (rather than based on Icon's belief that the Licenses remain in full effect). Pl. Br. at 36. Icon has not adduced evidence, whether from pre-litigation correspondence or otherwise, contradicting this statement. Icon has not invoked the Sell-Off provision as the basis for any of its counterclaims or affirmative defenses. Furthermore, the Continued Uses cast doubt on Icon's purported reliance on a Sell-Off Period which offers no safe harbor for such conduct.

Finally, equitable estoppel does not insulate Icon from liability arising from its use of the Collateral after it learned of North Star's position that all of Icon's rights in the Collateral, including the Sell-Off Rights, were extinguished. *See Restatement (Third) of Unfair Competition* § 29 (1995) ("Consent is terminated when the actor knows or has reason to know that the trademark owner is no longer willing to permit the particular use."). Moreover, the existence of a sell-off right would provide no defense to claims arising from the Continued Uses. Thus, equitable estoppel does not preclude North Star's claims.

### B.  Unfair Competition Claim

Icon moves for summary judgment against North Star's claim of common law unfair competition based on (1) the same "use in commerce" argument discussed previously, *see supra* section (II)(a)(1), and (2) lack of bad faith. Def. Br. at 20–22; Def. R. Br. at 27–28. Only the second requires discussion.

"Under New York common law, the standards for trademark infringement and unfair competition are virtually identical to the standard under the Lanham Act, except that New York

law requires an additional showing of bad faith." *Soter Techs., LLC v. IP Video Corp.*, 523 F. Supp. 3d 389, 397 (S.D.N.Y. 2021) (cleaned up). The Court finds that the Continued Uses, which cannot be justified with reference to the Licenses' Sell-Off Period – and which appear to continue to the present notwithstanding the Article 9 sale, the Form of Notice and subsequent course of conduct – raise genuine issues of fact as to bad faith. Thus, summary judgment is not appropriate at this juncture. *See Can't Live Without It*, 287 F. Supp. 3d at 419 (S.D.N.Y. 2018) ("Because . . . there exists a genuine factual dispute as to whether [bad faith] was present or absent here, neither party is entitled to summary judgment on [the unfair competition] claim."). Accordingly, Icon's motion for summary judgment is denied in its entirety.

## III. The Sealing Motions are Granted in Part and Denied in Part

Having temporarily granted the parties' letter-motions to seal pending disposition of the instant summary judgment motions, *see* ECF Nos. 122, 128, 140, 151, 153, the Court now considers what materials may remain under seal or redacted moving forward. The Court applies the three-part test for determining whether the common law right of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

### A. The Summary Judgment Materials are Judicial Documents

"By virtue of having been submitted to the court as supporting material in connection with a motion for summary judgment," the materials the parties seek to redact "are unquestionably judicial documents under the common law" to which the presumption of public access attaches. *Id*. at 123.

### B. A Strong Presumption of Access Attaches to the Summary Judgment Materials

The weight accorded the presumption of public access is "governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such

information to those monitoring the federal courts." *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995) ("*Amodeo II*"). This material generally "fall[s] somewhere on a continuum from matters that directly affect an adjudication to matters that come within a court's purview solely to insure their irrelevance." *Id*. Documents submitted in connection with motions for summary judgment are entitled to "the highest" presumption of access and should not be sealed or redacted "absent the most compelling reasons." *Lugosch*, 435 F.3d at 121. Documents do not "receive different weights of presumption based on the extent to which they [are] relied upon in resolving the motion." *Id*. at 123. Accordingly, the Court finds that a strong presumption of access attaches to all the judicial documents at issue.

### C. Competing Considerations Outweigh the Presumption of Access for Some of the Materials in Question

The Court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120. Established "competing considerations" include "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure" and of third parties. *Id.*; *see also Amodeo II*, 71 F.3d at 1050–51. In addition, "[f]inancial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public." *Amodeo II*, 71 F.3d at 1051. Courts should also consider the "nature and degree of injury" that may result from disclosure, the "reliability of the information" and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Id*. "If such factors outweigh the value to the public of accessing the document at issue, then that document should be sealed." *Matter of Upper Brook Cos.*, No. 22-MC-97 (PKC), 2023 WL 172003, at *1 (S.D.N.Y. Jan. 12, 2023). Parties "opposing disclosure [of a judicial document] must make a particular and specific

demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection." *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009). "[B]road allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test." *Id*.

"[D]etailed financial information concerning a privately held business, not previously disclosed to the public, will in most cases warrant confidential treatment." *Closed Joint Stock Co. "CTC Network," v. Actava TV, Inc.*, No. 15-CV-8681 (GBD) (BCM), 2016 WL 1364942, at *3 (S.D.N.Y. Mar. 28, 2016). This is particularly true where revelation of "specific business information and strategies . . . may provide valuable insights into a company's current business practices that a competitor would seek to exploit." *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (quotation omitted).

The Court finds that, for the proposed redactions specified in this paragraph, the privacy interests of the parties in certain financial records and business strategies outweigh the presumption of public access. Accordingly, the following information related to the number of Minkoff brand units Icon sold and various dollar amounts for these sales may be properly redacted: ECF No. 92-9 (ECF No. 97-2); ECF No. 119-7 (ECF No. 117-6) at 29:15–16. The same goes for the percentage advertising and marketing earmark, the minimum limit for Icon's liability insurance policy and the percentage royalty owed and amounts due (or retained) under the Licenses – and the attached projections of net sales, list of approved retailer customers and distributors, list of off-price retail customers and schedule of prices to be paid by retail stores and ecommerce sites owned or operated by RML or its affiliates: ECF Nos. ECF No. 157-1 (158-1–2); ECF Nos. 157-2–5 (ECF Nos. 158-3–6); ECF No. 119-7 (ECF No. 117-6) at 35:5; ECF No. 130-16 (ECF No. 136-11).

The Court finds that, for the proposed redactions specified in this paragraph, the privacy interests of third parties – relating to their identity, the terms of financial negotiations, contracts, or outstanding debts and balances with the litigants or nature and timing of the commercial relations therewith – outweighs the presumption of public access. *See SEC v. TheStreet.Com*, 273 F.3d 222, 232 (2d Cir. 2001) ("[T]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation."). Thus, the following redactions are proper: ECF No. 93-1 (ECF No. 98); ECF No. 93-5 (ECF No. 98-1); ECF No. 108-3 (ECF No. 116-1); ECF No. 119-2 (ECF No. 117-2); ECF No. 119-5 (ECF No. 117-4) at 68:19–69:7; ECF No. 119-6 (ECF No. 117-5) at 78:3-4; ECF No. 130-1 (ECF No. 136) at 43:1–43:18, 43:25–44:17, 59:4-60:20, 136:9–137:2, 137:5–6; ECF No. 130-2 (ECF No. 136-1) at 2; ECF No. 130-7 (ECF No. 136-3) at 31:7–15, 31:17–19, 33:3–9, 43:17, 43:21 50:10, 65:17–18, 65:25–66:5; ECF No. 130-8 (ECF No. 136-4) at 142:17–25; ECF No. 130-11 (ECF No. 136-7); ECF No. 130-15 (ECF No. 136-10) at 68:19–69:7.

However, the privacy interests of North Star and the RM Defendants in their financial records – as well as third-party Rosenthal's interest therein – does not outweigh the presumption of access insofar as certain information pertaining to the Article 9 sale is concerned. North Star and the RM Defendants put at issue, through their summary judgment motion, the commercial reasonableness of that transaction. They contend that commercial reasonableness revolves around price. Pl. Br. at 22. That North Star and the RM Defendants seek confidential treatment of price information – that they also represent is central to disposition of an issue in dispute – cuts against their redaction request. *See Gentile v. Crededio*, No. 21-CV-08528 (LTS), 2023 WL 2535192, at *2 (S.D.N.Y. Mar. 16, 2023). Under these circumstances, they cannot shield the price of the sale from public view. Accordingly, the following proposed redactions are <u>not</u>

permitted: ECF No. 108-4 (ECF No. 116-2) ¶ 3; ECF No. 130-8 (ECF No. 136-4) at 140:11–14; ECF No. 130-20 (ECF No. 136-12) (purchase price only). However, the following particulars of payment structure – including details regarding, and sources of funding for, payments to creditors of the RM Defendants – and the financial particulars of assets not included in the sale, may be redacted: ECF No. 108-4 (ECF No. 116-2) at 7–8; ECF No. 130-4 (ECF No. 136-2); ECF No. 130-8 (ECF No. 136-4) at 104:15–19, 104:24–105:5, 105:12–15, 105:23–106:2, 106:5–15, 114:17–25; ECF No. 130-13 (ECF No. 136-9); ECF No. 130-20 (ECF No. 136-12) (excepting the purchase price).

The following evidence concerning the fact of Icon's potential partnership with Bluestar as an investor in purchasing the Collateral is necessary to the public's ability to understand the commercial reasonableness analysis: ECF No. 119-5 (ECF No. 117-4) at 50:18–22. It may not be redacted. However, the following confidential details and terms of the Bluestar negotiations may be redacted: ECF No. 144-4 (ECF No. 149-2). Similarly, the letter from a third-party entity to RML detailing a proposal for purchasing RML's assets may be redacted to protect the identity and confidential information of the third-party entity but may not be filed under seal in its entirety. ECF No. 144-5 (ECF No. 149-3). The following descriptions of license terms discussed between Sunrise and the RM Defendants – which bear on North Star's alleged "usurpation" of Icon and "collusion" with the RM Defendants – may also not be redacted: ECF No. 130-10 (ECF No. 136-6) at 46:17–21; ECF No. 130-12 (ECF No. 136-8). However, the following details of the finances and negotiations of Icon's principals in relation to the possible investment with Bluestar, and the structure of that investment, may be redacted: ECF No. 119-12 (ECF No. 117-7) at 3; ECF No. 130-1 (ECF No. 136) at 157:2–5; ECF No. 130-7 (ECF No. 136-3) at 129:8–10; ECF No. 130-8 (ECF No. 136-4) at 116:3–5, 116:19–20.

Given the irrelevance of the successor liability issue, confidential and commercially sensitive details related to ownership of third-party RMHCL may be redacted: ECF No. 119-1 (ECF No. 117-1) at 58:25–60:7; ECF No. 143 (ECF No. 148) ¶ 3. The same goes for the ownership interests of Icon's owners and the members of North Star and the details of the commercial relationships of Sunrise and third parties: ECF No. 119-4 (ECF No. 117-3) at 26:20, 26:23, 27:13–16, 28:2–7, 28:23–29:3, 29:10–16, 29:24–30:2, 30:16–20; ECF No. 130-7 (ECF No. 136-3) at 65:17–18, 65:25–66:5; ECF No. 130-9 (ECF No. 136-5); ECF No. 144-2 (ECF No. 149-1) at 17:8–18:4.

The parties seek to redact certain information that is already public. *See, e.g.*, Def. R. Br. at 20 (redacting caselaw parentheticals). Such redactions are <u>not</u> permitted. *See In re Telegraph Media Grp. Ltd.*, No. 23-MC-215 (JGLC), 2023 WL 5770115, at *6 (S.D.N.Y. Sept. 6, 2023) (denying motion to seal information that is already a matter of public record).

To the extent the Court approves or denies a request for redaction, such determination extends to all portions of documents, including memoranda of law and 56.1 statements and responses, which (1) are duplicative of the same redaction, (2) incorporate a corresponding or substantially similar redaction or (3) describe or reference the content of the information so redacted. Any redactions not herein approved – as indicated by direct citation or blessed by incorporation in one of the three ways just described – are denied. "Because the common law framework is dispositive" of the motions to redact, "the Court need not undertake the First Amendment analysis." *Id*. at *6.

## CONCLUSION

For the reasons set forth above, North Star's motion for summary judgment is GRANTED and Icon's motion for summary judgment is DENIED. The parties' motions to seal

are GRANTED in part and DENIED in part. The parties are directed to publicly file versions of their summary judgment materials that conform to section III of this Order no later than **January 12, 2024**.

The parties are directed to meet and confer regarding settlement and a proposed fifth amended case management plan setting forth deadlines for any amended pleadings and the second phase of discovery. The parties indicated an interest in a settlement conference before Magistrate Judge Aaron following the Court's disposition of the instant motions, *see* ECF No. 152 at 5, which the parties shall also discuss. The parties shall submit a joint letter, no longer than five pages excluding attachments, regarding the topics outlined in this paragraph no later than **February 2, 2024**. The parties shall attach to the letter a proposed fifth amended case management plan.

The Clerk of Court is directed to terminate ECF Nos. 75, 76, 91, 104 and 156.

Dated:  January 3, 2024
        New York, New York

                                        SO ORDERED.

                                        _Jessica Clarke_
                                        _____
                                        JESSICA G. L. CLARKE
                                        United States District Judge